FILED
2014 MAR 18 P 2:05
CLERK
U.S. BANKRUPTCY
COURT - PGH

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:

| | | |
|---|---|---|
| ROBERT R. MCKINNEY | : | Case No. 11-27770-TPA |
| *Debtor* | : | Chapter 13 |
| | : | |
| WENDY L. MCKINNEY | : | |
| *Movant* | : | |
| | : | |
| v. | : | |
| | : | |
| ROBERT R. MCKINNEY | : | Related to Doc. Nos. 66, 72,  79 |
| *Respondent* | : | |


*Appearances:*  Mary Bower Sheats, Esq., for the Movant
Dai Rosenblum, Esq., for the Respondent


## MEMORANDUM OPINION


Presently before the Court for decision is the ***Objection to Confirmation of Amended Chapter 13 Plan Dated March 5, 2013*** filed by Wendy L. McKinney ("Wife"), the former spouse of the Debtor, at Document No. 72 ("Plan Objection") and the related matter involving the ***Debtor's Objection to Proof of Claim No. 3-3 of Wendy L. McKinney*** filed by the Debtor at Document No. 79 ("Debtor's Objection").


An evidentiary hearing affecting these matters was held on November 21, 2013. Prior to the hearing, the Parties agreed that the only evidentiary issue to be determined by the Court at that time was whether the Debtor's mortgage payment for his "second office" located at 399 Pittsburgh Road, Butler, PA 16003 ("Pgh. Rd. Property" or "Property") was necessary for the continuation, preservation and operation of the Debtor's business, and thus properly deductible in computing his "projected disposable income," or alternatively, was a proper

secured claim reducing the Debtor's disposable income.   All other matters that the Parties believed to be of an evidentiary concern were stipulated to by them.

There are three issues to be determined in connection with the *Plan Objection*: (1) does the Second Amended Plan of March 5, 2013 ("2nd Amd. Plan") meet the requirements of *11 U.S.C. §1325(a)(4),* otherwise known as the "Best Interests of Creditors Test" or alternatively, the "Liquidation Alternative Test;" (2) does the 2nd Amd. Plan meet the requirements of *11 U.S.C. §1325(b)(1)(B)*, otherwise known as the "Best Efforts Test;" and, (3) was the 2nd Amd. Plan filed in good faith under *11 U.S.C. §1325(a)(3)*.  Regarding the *Debtor's Objection*, the Debtor disputes Wife's calculation of the alimony arrears she claims must be paid through the 2nd Amd. Plan.

For the reasons explained below, the *Plan Objection* is granted in part and denied in part, and the *Debtor's Objection* is granted. Confirmation of the 2nd Amd. Plan is denied. [1]

## STATEMENT OF FACTS

Shortly after the divorce between the Parties became final, the Debtor filed for relief under Chapter 13 of the Bankruptcy Code. The Debtor's impetus for the filing appears to have been an equitable distribution order ("State Court Order") entered in the divorce proceeding.  The State Court Order required the Debtor to turn over to Wife certain retirement and life insurance assets as well as the marital residence.  The Debtor was also directed, in the form of an equitable distribution award, to pay Wife $161,422.42 within thirty days of the State

---

[1]    The Court's jurisdiction under *28 U.S.C. §§157* and *1334* was not at issue.  This is a core proceeding pursuant to *28 U.S.C. §§157(b)(2)(A), (B), (L)* and *(O)*.  This *Memorandum Opinion* constitutes the Court's findings of fact and conclusions of law pursuant to *Fed.R.Bankr.P. 7052.*

Court Order, $2,500 per month in modifiable alimony, plus an additional $300 per month in alimony arrears for 24 months, and $10,000 for Wife's attorney's fees.

According to the Debtor's Bankruptcy Petition, the Debtor has current aggregate monthly income of $8,964.31 from his financial planning business and rental properties. The Debtor's Schedules and claims filed also indicate the Pgh. Rd. Property had a fair market value of $157,000 as of the filing date, subject to a first mortgage lien of $82,593.75. On Schedule C, the Debtor claimed an exemption of $11,972 in the Pgh. Rd. Property. The Debtor's Schedules A, B, and C reflect that he proposes to retain nonexempt property, including the Pgh. Rd. Property, with a total gross value of $175,429.54.  Form B22C, used to support the Debtor's 2nd Amd. Plan, includes a monthly deduction of $1,038.90 for payments on the Pgh. Rd. Property.

On February 10, 2012, Wife filed her Objection to the Debtor's original Plan at Document No. 19 asserting that the Plan should not be confirmed, because it was not filed in good faith, it failed to meet the *11 U.S.C. §1325(a)(4)* Liquidation Alternative Test, and it proposed to allow the Debtor to retain substantial, nonexempt assets that rightfully should go to unsecured creditors.  On the same day, Wife also filed a *Motion for Relief from the Automatic Stay* at Document No. 20 ("Stay Motion") and a *Complaint to Determine Dischargeability* at Case No. 12-2059 ("Adversary Proceeding") to preserve her rights under the State Court Order.

Ultimately, the Parties were able to resolve the Adversary Proceeding and the *Stay Motion* by Stipulation and entry of a *Consent Order* dated August 2, 2012, filed at Document No. 48.  In resolving the *Stay Motion*, the Debtor agreed to transfer $286,761.95 in retirement and life insurance assets to Wife as well as the marital residence.  The Debtor and

3

Wife were also afforded relief from the stay to litigate in state court issues concerning the State Court Order and seek a modification of alimony.[2]

Upon obtaining relief to pursue further action in state court, Wife did seek a modification of the alimony award.  On January 7, 2013, the state court extended the Debtor's $2,500 monthly alimony obligation by thirty-six months for a total of sixty months — the effect of which was to grant Wife an additional $90,000 in alimony.

The Debtor never appealed the increased alimony award and on March 6, 2013, he acquiesced in this determination by the state court by filing the 2nd Amd. Plan to account for this increased alimony obligation. Under, the 2nd Amd. Plan, the Debtor proposes to pay an estimated $6,550.79 to general unsecured creditors and $171,744.88 to priority unsecured creditors, including payment of Wife's modified alimony award in its entirety.  Wife responded by filing the *Plan Objection* currently under consideration.

Wife has filed two proofs of claim in this case.  Proof of Claim No. 3-3, is the sole subject of the *Debtor's Objection* and involves the alimony award, which under the Bankruptcy Code is a "domestic support obligation" entitled to priority.  *See 11 U.S.C. §101(14A)* and *§507(a)(1).*  Wife indicates that as of May 1, 2013, her alimony claim in this regard totaled $18,549.21 in alimony arrears plus a claim of $2,800 per month toward a domestic

---

[2]      The *Stay Motion* and the original proposed order that accompanied it proposed relief only in the form of permission for Wife to be able to return to state court to effectuate the transfer of certain property pursuant to the State Court Order.  It referenced nothing about seeking a modification of alimony.  However, several months later when the Parties later submitted a lengthy, proposed consent order to resolve the *Stay Motion,* there was language in the text to the effect that the stay relief would also include the ability to seek "modification of the alimony order."  This change was not highlighted for the Court.  Had it been, even though it is arguable that seeking a modification of alimony is excepted from the automatic stay via *§362(b)(2)(A)(ii)*, it is quite possible the Court would not have approved that provision due to concerns discussed *infra. See n. 18* and *19.*  At the very least, Counsel should have brought this significant change to the Court's attention so it could have received proper consideration allowing it to be approved *sub silento.*

support obligation. The *Debtor's Objection* disputes Wife's calculation of the alimony arrearage component. The other claim by Wife, Proof of Claim No. 4-2, relates to the remaining equitable distribution award of $161,422.42. The Debtor has not objected to this claim.

## DISCUSSION

### A.    Plan Objection

The burden of proof for an objection to confirmation of a Chapter 13 Plan is a shifting one. The party objecting to confirmation, here Wife, bears the initial burden of presenting some evidence to support her position. *In re McGilberry*, 298 B.R. 258, 260 (Bankr. M.D. Pa. 2003) (citing *In re Fricker,* 116 B.R. 431, 437 (Bankr. E.D. Pa. 1990)); *In re Fries,* 68 B.R. 676, 685 (Bankr. E.D. Pa. 1986); *In re Navarro,* 83 B.R. 348, 355 (Bankr. E.D. Pa. 1988); *In re Crompton*, 73 B.R. 800, 808 (Bankr.E.D. Pa. 1987); *see also In re Jensen*, 369 B.R. 210, 234 (Bankr. E.D. Pa. 2007). Once the objecting party satisfies this initial burden, the burden shifts to the debtor, who always holds the ultimate burden of proof in the matter, to prove by a preponderance of the evidence that the plan complies with the requirements of *11 U.S.C. §1325.* *McGilberry*, *supra*.

### (1)  The Liquidation Alternative Test

Section 1325 of the *Bankruptcy Code* sets forth the specific requirements for confirmation of a debtor's Chapter 13 plan. One critical requirement is for the Court to determine that,

> the value, as of the effective date of the plan, of property to be distributed under the plan on account of each *allowed unsecured claim* is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 ....

*11 U.S.C. §1325(a)(4)* (emphasis added).  This is known as the "Bests Interests of Creditors Test" or more commonly referred to in this District as the "Liquidation Alternative Test" ("LAT").

Two calculations are necessary to determine whether the Debtor meets the LAT: (1) an estimate of the value of the distribution available for unsecured creditors in the event of a Chapter 7 liquidation; and (2) the amount to which distributions must be discounted to reflect their present value as of the effective date of the plan. *See, e.g.*, *In re Hardy*, 755 F.2d 75, 76 (6th Cir. 1985).  *See also In re Dixon*, 140 B.R. 945, 947 (Bankr. W.D.N.Y. 1992).  A component of Item 2, above, is the subtraction of the costs of liquidation, including the trustee's commission, when calculating the amount available for distribution to unsecured creditors. *See In re Barth,* 83 B.R. 204, 206 (Bankr. D. Conn. 1998).

Although no direct evidence was offered by either Party regarding the net value of the Debtor's nonexempt assets if liquidated for the benefit of unsecured creditors, Wife argues that the 2nd Amd. Plan does not meet the LAT for two reasons: (1) the Debtor is only paying his general unsecured creditors $6,550.79 over the life of the 2nd Amd. Plan while retaining substantial nonexempt assets even the Debtor admits possess a net liquidation value approximating $109,000; and, (2) the Debtor improperly includes the projected value of his alimony payments going forward as priority unsecured debt to demonstrate his 2nd Amd. Plan

satisfies the LAT.[3]  As previously noted, the Debtor admits the nonexempt assets have a gross

value of at least $175,429.54.  For the foregoing reasons, Wife has met her initial burden.

Not unexpectedly, in contrast, the Debtor argues that the 2nd Amd. Plan in fact

meets the requirements of the LAT.  The Debtor admits that in order to comply with *11 U.S.C.*

*§1325(a)(4)*, he must pay his general unsecured and priority unsecured creditors at least

$109,029.54.[4] CR Ex. 17.[5]  In arguing that the 2nd Amd. Plan meets that threshold, the Debtor

relies on $171,744.88 in payments to be made on priority unsecured claims, i.e., tax claims, the

alimony and arrearages to be paid to Wife during the Plan term, and $6,550.79 in payments on

---

[3]     For purposes of the LAT, Wife argues in her *Pretrial Brief* filed at Document No. 110,
that the Debtor has non-exempt property valued at $246,632.31.  However, Wife's calculation fails to
account for the costs of liquidation including closing costs and trustee fees.  *See Lundin, Chapter 13
Bankruptcy at  §160.1 In General: Plan Payments vs. Hypothetical Liquidation* ("For purposes of the
hypothetical liquidation in Section 1325(a)(4), after valuing all assets that would be available in a Chapter
7 case, it is appropriate to deduct the costs of liquidation, including trustee's fees and other administrative
expenses.")  Based on the numbers contained in Paragraph 7(a)-(r) of the *Joint Stipulation of Facts* filed
at Document No. 120, the Debtor proposes only to retain nonexempt assets approximating $175,429.54 in
gross value, which assets are specifically identified in Paragraph 7 of the Stipulation.

[4]     The Debtor's *Pretrial Brief* filed at Document No. 133 provides an updated analysis of
the application of the LAT in this case that includes deductions for the Trustee's fees and closing costs.
According to the *Pretrial Brief*, if the Debtor's nonexempt assets were liquidated, they would yield
$116,000.79 for his unsecured creditors which is at odds with the $109,029.54 amount referenced in the
2nd Amd. Plan.  Factual statements in briefs not supported by proper evidence of record cannot be
considered by the Court.  *In re Fabrizio*, 369 B.R. 238, 246 (Bankr. W.D. Pa. 2007).  *See Versarge v.
Township of Clinton N.J.,* 984 F.2d 1359, 1370 (3d Cir.1993) ("we have repeatedly held that
unsubstantiated arguments made in briefs or at oral argument are not evidence to be considered by this
Court"); *Bell v. United Princeton Properties, Inc.,* 884 F.2d 713, 720 (3d Cir.1989) ("statements made in
briefs are not evidence of the facts asserted"); *Jersey Cent. Power & Light Co. v. Township of Lacey,* 772
F.2d 1103, 1109–10 (3d Cir.1985) ("[l]egal memoranda and oral argument are not evidence and cannot by
themselves create a factual dispute sufficient to defeat a summary judgment motion").  Furthermore, for
reasons to become apparent below, this variance in amounts is a distinction without a difference.

[5]     The matters denominated as "CR" ("Courtroom") identify courtroom exhibits used by the
Parties during the evidentiary hearing.  Their use as to any matters involving the issues at hand was
stipulated to by the Parties.

general unsecured claims.[6] CR Ex. 17.  By adding the payments on the priority unsecured claims and the general unsecured claims together, the Debtor argues the 2nd Amd. Plan meets the LAT, making it confirmable, and thereby allowing him to keep all of his nonexempt assets.

In calculating the applicable asset and claim values for meeting the requirements of the LAT, the Bankruptcy Code distinguishes between prepetition and postpetition alimony. *See In re Young*, 497 B.R. 904, 916 (Bankr. W.D. Ark. 2013).  While both prepetition and postpetition domestic support obligations meet the Code's definition of a "claim," *11 U.S.C. §502(b)(5)* disallows any claim "to the extent that ... such claim is for a debt that is unmatured on the date of the filing of the petition and that is excepted from discharge under section 523(a)(5) of this title[.]" *Id.* (quoting *11 U.S.C. §502(b)(3)*).  *See also 1-8 Collier Family Law and the Bankruptcy Code P. 8.03.*  In other words, only the prepetition portion of a domestic support obligation can be an "allowed claim" under *Section 502(b)(5)*.  Postpetition domestic support obligations fall into the category of "unmatured" claims, because they are not due at the time the debtor files for bankruptcy.  *In re Young*, 497 B.R. at 917.  *See also Burnett v. Burnett (In re Burnett)* 646 F.3d 575, 582-83 (8th Cir. 2011).

Technically, the Bankruptcy Code does not even permit the filing of a proof of claim for a postpetition domestic support obligation.  *In re Young*, 497 B.R. at 916.  Instead the Bankruptcy Code requires the Debtor to remain current on his or her postpetition domestic

---

[6]   The Debtor's original plan dated January 18, 2012, filed at Document No. 11, did not include his proposed payment to priority unsecured creditors in order to meet the LAT.  In the original plan, the Debtor proposed to pay an estimated 43% distribution ($109,029.54) to general unsecured creditors.  It was not until after the Debtor's alimony obligation was extended for 36 months that the Debtor apparently decided to include this priority obligation in meeting the requirements of the LAT. Moreover, *Local Bankruptcy Form 10* does not allow a debtor to add his unsecured, priority and general, unsecured claims to meet the LAT.  The Form requires a debtor to estimate only the amount available for distribution to general unsecured creditors. *See Local Form 10 ¶16.*

support obligations as a condition of confirmation. *11 U.S.C. §1325(a)(8); In re Young*, 497 B.R. at 918 (failure to pay a domestic support obligation that becomes payable after the petition may result in dismissal or conversion). *See also In re Miller*, 501 B.R. 266, 285 (Bankr. E.D. Pa. 2013); *In re Bonito*, No. 09-31888, 2010 WL 3398396 (Bankr. D. Conn. Aug. 26, 2010). Accordingly, a debtor may deduct postpetition domestic obligation payments from his or her projected disposable income calculation, but, unless modified by local rule or court order, only the debtor's prepetition domestic support obligations are to be paid through the plan. *Id. See 8 Collier Family Law and the Bankruptcy Code P. 8.03(b)* (Chapter 13 plans typically do not provide for distributions on claims which are not allowed claims).

As such, Wife is correct in claiming that the Debtor is not entitled to include payments on his postpetition domestic support obligation as part of his plan base to demonstrate compliance with *11 U.S.C. §1325(a)(4)* since such obligation is not an "allowed claim" under *11 U.S.C. §502(b)(5)*. When the postpetition domestic support obligation payments are deducted from the proposed plan base, the Debtor is only paying his priority unsecured creditors a total of $26,744.88 ($171,744.88 less $145,000).[7] Thus, even assuming *arguendo* that Debtor may add payments to his priority unsecured creditors and general unsecured creditors together to meet the requirements of *11 U.S.C. §1325(a)(4)*, his 2nd Amd. Plan remains unconfirmable.[8]

---

[7] The Debtor is proposing to pay 58 months of alimony at $2,500 per month through the 2nd Amd. Plan (58 x $2,500 totals $145,000).

[8] The Debtor relies on *In re Edwards*, No. 11-80962, 2012 WL 3584769 (Bankr. W.D. La. Jan. 5, 2012) in support of his argument that payments to priority unsecured creditors should be "counted" for purposes of the LAT calculation. However, under the facts presented here the Court finds that argument unpersuasive. In *Edwards* the priority unsecured claim that the court allowed to be considered in applying the LAT was entirely an allowed claim. By contrast, as discussed above, the Court concludes that the overwhelming majority of the purported priority unsecured claim as stated in the 2nd Amd. Plan ($145,000 out of $171,744.88) is for future alimony obligation and is thus <u>not</u> an allowed claim. Therefore, even if the Court followed *Edwards*, that would still not help the Debtor.

9

Based on the Court's calculations derived from the record before it, by eliminating the postpetition domestic support obligation payments from the 2nd Amd. Plan and adding $6,550.79 in proposed payments to the general unsecured creditors, the Debtor is paying only $33,295.67 ($26,744.88 plus $6,550.79) to his eligible priority unsecured and general unsecured creditors. This is clearly insufficient to meet the Debtor's own, admitted liquidation analysis minimum threshold of $109,029.54. Thus, the Debtor has failed to meet his ultimate burden by demonstrating that his Plan meets the requirements of *11 U.S.C. §1325(a)(4)* and that the Plan is therefore not confirmable for that reason.

### *(2)  Disposable Income Test*

The second issue implicated by the *Plan Objection* relates to *11 U.S.C. §1325(b)(1)*, which provides, in relevant part:

> (b)(1)  If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan–
>
> ...
>
> (B) the plan provides that all of the debtor's projected disposable income to be received in the applicable commitment period beginning on the date that the first payment is due under the plan will be applied to make payments to unsecured creditors under the plan.

This is the so-called "disposable income" test for plan confirmation, and as can be seen, the concept of "projected disposable income" is of key importance.  The Bankruptcy Code does not define projected disposable income, but it does define what is meant by a debtor's disposable income. *See 11 U.S.C §1325(b)(2); Hamilton v. Lanning*, 560 U.S. 505 (2010).

Of particular relevance in the present case are *Section 1325(b)(2)(A)(i)* and *(B)*, which provide:

> (2)  For purposes of this subsection, the term "disposable income" means current monthly income received by the debtor (other than child support payments, foster care payments, or disability payments for a dependent child made in accordance with applicable nonbankruptcy law to the extent reasonably necessary to be expended for such child) less amounts reasonably necessary to be expended--
>
> > (A)(i) for the maintenance or support of the debtor or a dependent of the debtor, or for a domestic support obligation, that first becomes payable after the date the petition is filed; and
> >
> > ...
> >
> > (B) if the debtor is engaged in business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business.

*11 U.S.C. §1325(b)(2)(A)(i)* and *(B)*.   Since the Debtor is an above-median income debtor, also of potential importance is *Section 1325(b)(3)*, which provides in relevant part:

> (3)  Amounts reasonably necessary to be expended under paragraph (2) ... shall be determined in accordance with subparagraphs (A) and (B) of section 707(b)(2), if the debtor has current monthly income, when multiplied by 12, greater than--
>
> > (A) in the case of a debtor in a household of 1 person, the median family income of the applicable State for 1 earner;

*11U.S.C. §1325(b)(3)(A)*.

When examining the Debtor's projected disposable income, the Statement of Current Monthly Income and Calculation of Commitment Period and Disposable Income (Official Form 22C, hereinafter "Form B22C") "is presumed to be an accurate reflection of a

debtor's projected disposable income for purposes of *11 U.S.C. §1325(b)(1)*." *In re May,* 381 B.R. 498, 509 (Bankr. W.D. Pa. 2008). According to the Debtor's Form B22C in this case, he claims projected disposable income of $318.70 per month, which figure was arrived at by including deductions for his future domestic support obligation and payments on the Pgh. Rd. Property, among other deductions. *See* CR Ex. 2. The deductions for the domestic support obligation taken by the Debtor is clearly proper under *Section 1325(b)(2)(A)(i)* and the Court does not understand Wife to have any objection in that regard.

As to the Pgh. Rd. Property, relying on *Section 1325(b)(2)(B)*, the Debtor claims his payments related to it are reasonably "necessary for the continuation, preservation, and operation" of his business. Debtor also contends that payments related to the Pgh. Rd. Property can be deducted when calculating projected disposable income as payments on a secured debt pursuant to *Section 1325(b)(3)*. Wife strongly disagrees and objects to any deduction the Debtor claims in that regard. She argues that the Pgh Rd. Property is not actually used by the Debtor at all for his business or at least is only minimally used in an effort to disguise it as a business office in order to claim the deduction. Rather, Wife contends the Pgh. Rd. Property is really an investment property for the Debtor and that monthly payments for it should not be allowed as a deduction when calculating his projected disposable income for purposes of the disposable income test. As noted, resolution of this factual dispute was the sole purpose for the evidentiary hearing.

The Pgh. Rd. Property contains a two-story, former single-family home located approximately four miles from the city of Butler, Pennsylvania. The Debtor and Wife had previously worked together to convert the structure to an office that could be used in the Debtor's financial planning business. The Debtor takes the position that payments related to the

12

Pgh. Rd. Property can properly be characterized as business expenses, because he uses it in connection with that business. However, before any conclusion can be reached in that regard, it is necessary to consider in further detail both the Debtor's business and the history of his use of the Pgh. Rd. Property.

As indicated, the Debtor operates a financial planning or consulting business, counseling individuals on the best way to manage their investments and plan for the future.  The exact nature and legal status of that business is not entirely clear to the Court.  The Debtor seems to do business under the name "Bridgewater Wealth, Inc."  However, despite this designation, the Debtor states that this is simply a trade name he uses, and that no such corporation has ever been "activated." [9]  Debtor contends he is self-employed, and he would thus seem to be operating as a sole proprietor.

The Debtor has been affiliated with other entities in the course of his financial planning business.  Since December 2008 he has been affiliated with a broker/dealer by the name of LPL Financial and an RIA registered investment advisory firm, known as Stratos Wealth Partners.  According to the Debtor, none of these entities ever required the Debtor to maintain an office at any particular location.  Prior to 2008, Lincoln Financial gave the Debtor an inducement to maintain a certain office space that included support staff and other services that he took advantage of while at Lincoln's Georgetown Road, Butler, PA, group office location.  The Debtor's current business address is 435 Swanson Lane, Wexford, PA.

---

[9]    The Debtor attributes the apparently improper inclusion of the term "Inc." in his business name to his ignorance of the legal consequences thereof. *See* Debtor *Pretrial Brief* at 13.

The Debtor contends that the Pgh. Rd. Property functions in his business operation as a "casual office" which he has used at least since 2008 as a place to meet with clients.  The Debtor testified at the evidentiary hearing that relevant rules and regulations in the financial planning field draw a distinction between "permanent" and "satellite" offices, on the one hand, and "casual" offices on the other.[10]  The former are subject to strict requirements as to the maintenance of books and records, signage, marketing and staffing, all of which adds significant additional layers of cost related to such offices.  By contrast, a casual office can be "loaned, borrowed, or leased," and can be used as a place to meet with clients without all of the trappings required of a permanent or satellite office.  The Debtor testified that he has maintained the Property as simply a casual office to avoid the expense of placing a sign on it, keeping books and records, etc.

The Debtor testified that he has met with clients "occasionally" at the Pgh. Rd. Property in every calendar year since 2004.  He stated that he has met "just short of 20%" of his clients by number and revenue at the Property.  The Debtor has about 60 clients, which would mean that something less than 12 of them have ever met with him at the Property.  (The Debtor did not testify that he would always meet with particular clients at the Property, so it is possible that clients he has met with there would also have had other meetings with him at his main office or elsewhere).  Significantly, the Debtor also testified that it would not put him out of business if he were no longer able to use the Property for client meetings.

---

[10]    The Debtor has not pointed the Court to what specific rules and regulations he is relying upon, so the Court has been unable to review the purported requirements for itself.  The Wife did not challenge the existence of such rules and regulations.

Wife presented the testimony of herself and her divorce attorney, Mark Criss, in an effort to discredit the Debtor's contention that the use of the Property should qualify as a legitimate business expense.  Wife testified that she and the Debtor bought the Property a number of years ago with the intention of fixing it up so Debtor could use it for his business. The whole family worked on remodeling the Property for this purpose, but the couple's marital difficulties intervened, and by 2008 the Debtor was no longer using the Property to any great extent.  Wife testified that the Debtor moved his business operation to his current office at that point.  He took down a business sign that had been on the Property, cancelled cable and internet service,  and removed all of the furniture from the building, so there would have been nothing to sit on even if the Debtor wanted to continue to use it for client meetings.

Wife testified that she is also very familiar with the Property from driving by it on a regular basis on her way to and from work each day.  As she described it, by 2009 it started to show signs of neglect.  One winter day she noticed heavy frost on the windows indicating that there had been a water break in the vacant Property.  She described the Property as appearing very "run down" right up to the time of the hearing, with peeling paint, unwashed windows, faded curtains in the windows, and overgrown landscaping.  She described the back porch, which functions as the main entrance for the Property, as being in a decrepit state, with curled up floor boards and weeds growing up through them when she observed it just prior to the evidentiary hearing during the weekend of November 10, 2013.  Wife also testified that considerable debris was piled on the back porch during the period from January through August 2013.

Attorney Criss testified that he has represented Wife throughout the protracted divorce proceedings and is personally familiar with the Property, because it is on his driving route to the Butler County Courthouse.  He described an October 8, 2013 visit to the Property,

when he parked his vehicle and walked around the premises, finding the Property in "shabby" condition with peeling paint and debris cluttered around the outside of the building. An old sign was lying on the floor of the porch, along with some phone books in bags that were falling apart from the weather and had obviously been sitting there for months. Looking into the windows of the building, Criss saw "unorganized" piles of debris and personal property that he thought would be inconsistent with the Property being used as a business office.

Criss was also able to shed some additional light on the history of the Property's use that he gleaned from his representation of Wife in the divorce action. He testified that the Debtor actively used the Property for his office beginning in 2004, and had actually claimed rental income of $24,000 for it on his 2004 tax return. Then, due to either a change in the applicable rules or a change in the Debtor's affiliation (Criss was not sure which), the Debtor was no longer permitted to operate "remotely' and instead had to be located in the physical office of the entity with which he is affiliated. As a result, the Property fell into disuse, though Debtor said he would still occasionally meet clients there. Criss testified that in none of the Debtor's tax returns for 2005-2006 and 2009-2011 did he claim any rental income for the Property. Criss also stated that during one of the numerous hearings in the divorce case the Debtor had testified that by 2008 or 2009 he was no longer seeing any of his clients at the Property, and that at a hearing in 2012 the Debtor represented that his business office was "in Wexford." Criss recalled that the Debtor had never taken a position in the divorce case that the Property was a significant part of his business, but that he had nevertheless wanted to hang on to it.[11]

---

[11]   Wife testified that at some unspecified time the Debtor also bought a parcel on the other side of the road from the Property in the hope that Sheetz, a large, regional convenience store and gas retailer, or some other buyer might want to purchase it at a later time.

16

The testimony by Wife and Criss was credible, and viewed in isolation, very damaging to the Debtor's business expense argument. The Debtor did not dispute the general characterization of the Property as being in run down or shabby condition, however he insisted that he does occasionally meet clients there. He acknowledged that there was debris on the back porch for a period of months but said he had no other place to store it, because he is living in a small apartment, and that fortunately he had met with only one client at the Property during that period of time. He also acknowledged the presence of old telephone books on the porch as well, but claimed clients would somehow not be able to see them because one would have to walk up the steps to do so. The Debtor agreed that cable and internet service to the building had been discontinued, but said that through the use of "WiFi" he could get whatever internet access he needed for client meetings. He also admitted that there was a water leak inside the Property, though he explained that it was due to him having turned the thermostat down to 50 degrees to save money, not from a total lack of heat.

The Debtor stated he has a contract on the Property for someone to cut the grass (3-4 times per month during growing season) and clear the snow (as needed when he calls due to a client meeting). He said he has recently cleaned up the Property and is now actively trying to rent out some space in it, though he would continue to use it for client meetings as well. In his testimony he acknowledged that after 2008 most of the furniture had been removed from the Property when he ceased using it as his principal office, leaving only two desks and some chairs behind that were used for the occasional client meetings since that time, until those items of furniture were replaced sometime in 2013.

The Debtor also offered the testimony of Matthew W. Riggs, who prepared the Debtor's 2004-2012 tax returns. Riggs testified he was aware that the Debtor had moved his

main office from the Property to Georgetown Road, probably around 2008 or 2009, though he was not sure.  He does not personally know if the Debtor has continued to meet with clients at the Property since then.  He generally acknowledged that, aside from the 2008 tax return, none of the Debtor's recent returns have reflected any rental income on the Property or a deduction for rental expense.  As Riggs explained it, that would be done for tax planning reasons and would not provide any advantage in a loss year, implying that the other years in question were not loss years, though he did not testify to that effect.

The evidence presented at the evidentiary hearing concerning the condition and use of the Property was less than ideal, especially since the Parties had agreed this was the only factual question in dispute that required resolution.  It would have been helpful, for instance, to have had photographs or video provided to aid the Court in its determination.  This was not done by either side, however, and the Court must render a decision based on the evidence that was presented.

The Court finds that the evidence clearly shows that the Property is in poor condition and has not been properly maintained over the last five or six years.  In the Court's view, this fact is significant in and of itself on the question of whether a business deduction for the Property is appropriate when calculating the Debtor's projected disposable income.  Perhaps some enterprises could operate in a rundown and shabby office without undue concern that doing so would have a strong negative impact on their fiscal health, but a financial planning business would seem to be a particularly poor candidate for such a business.  The very nature of the financial planning business is such that clients and potential clients would naturally expect a certain level of solidity and respectability in anyone with whom they entrust their savings and investments, something that would be reflected in the premises occupied by such business.  The

18

Court is not saying the premises need be opulent, but it would expect that they at least be presentable.  The fact that the Property as described in the evidence is anything but presentable therefore weighs against the Debtor's contention that payments related thereto should be recognized as reasonably necessary business expenses.  Quite simply, given the state of the Property, the Court does not believe a reasonable owner of a financial planning firm would want to take clients there.

The evidence that the Debtor has not reflected a business use for the Property in any of his available tax returns since 2008 also weighs somewhat against the Debtor's position.  The explanation given by Riggs as to why this may have been so was couched only in general terms, not related to the specific circumstances of the Debtor.  Furthermore, Riggs admitted he has no personal knowledge as to whether the Debtor has used the Property for client meetings since 2008.  Had the Debtor done so to any meaningful extent, the Court would have anticipated some reflection of this fact on his tax returns in the form of a business expense or deduction.  The absence of any such indication suggests that the Property was not being used to any significant degree for business purposes after 2008.  Even though a loss may have resulted for tax purposes, one would surmise that if the property was truly considered a business resource, it would have been reflected as such on the tax return for completeness sake if for no other reason.

The evidence was also clear that if the Debtor does actually use the Property for client meetings, he does so only rarely.  The Debtor himself acknowledged his use of the Property for client meetings is only "occasional," and very tellingly he did not provide anything beyond this vague descriptor to quantify the extent of such purported meetings.  The Debtor also testified during the, at least, 8-month period in 2013 when there was debris on the back porch, only one client meeting had occurred at the premises.  Assuming this to be representative of the

normal frequency of client meetings at the Property in recent years, the Court finds it to be less than an incidental use, bordering on a nullity.  The Debtor could just as easily use a local eatery for the purposes he claims the Property is necessary — and from a marketing standpoint — be much better off.

Such a low level of use is woefully insufficient to support a conclusion that payments on the Property are necessary for the "continuation, preservation, and operation" of the Debtor's business as required under *11 U.S.C. §1325(b)(3)*.  Put another way, can the use of the Property a couple of times a year, probably for no more than a few hours (there was no testimony as to the typical length of client meetings), possibly be necessary for the Debtor to continue, preserve and operate his business?  Although the Court's research reveals no bankruptcy cases directly pertaining to this issue, in the Court's view, the answer to the above question must clearly be "no."   Indeed, the Debtor himself admitted as much when he testified his business would continue to function even if he were no longer able to use the Property for client meetings.

The Court is not attempting to dictate what the Debtor may or may not do with the Property — it merely finds based on the use as demonstrated by the evidence presented, he cannot use the expenses he incurs for maintaining the Property as a business expense deduction and thereby lower his projected disposable income for purposes of the *Section 1325(b)(1)(B)* test.

The dearth of cases exploring the limits of the business expense provision of *11 U.S.C. §1325(b)(2)(B)* provides good reason for the Court to also look elsewhere for possible guidance.  One obvious source in this regard is the federal income tax law, based on the intuitive premise that a purported business expense that fails to qualify as a legitimate deduction for purposes of income tax should also be suspect as a "deduction" under *Section 1325(b)(2)(B)*.

*See, e.g., In re Fletcher,* 248 B.R. 48, 51 (Bankr. Vt. 2000) (bankruptcy court can look to the Internal Revenue Code to determine whether the Debtor is engaged in business).   *See also Lundin, Chapter 13 Bankruptcy* at *§379.1 Form B22C: Statement of Current Monthly Income.*

When the Court looks toward tax law for assistance in reaching a decision, its conclusion that the Debtor should not be permitted to deduct expenses related to the Property in calculating his disposable income is confirmed.   A fundamental aspect of tax law is that the taxpayer bears the burden of establishing he is entitled to the deduction he claims, and is required to keep records sufficient to support such deduction.   *Robinson v. C.I.R.*, 487 Fed. App'x. 751, 753 (3d Cir. 2012).   Expressed somewhat differently, a court should begin with the presumption that expenses are not deductible since a deduction from gross income is a matter of legislative grace, not right. *See, e.g., C.I.R. v. Sullivan*,  356 U.S. 27, 28 (1958).

Many cases have rejected claims for business expense deductions when the only evidence provided by the taxpayer in support thereof was in the nature of self-serving testimony or vague and generalized approximations of a business use.   *See, e.g., In re Berardi*, 70 Fed. App'x. 660 (3d Cir. 2003) (taxpayer/debtor failed to provide evidence to substantiate his claimed business deductions); *Miravalle v. C.I.R.*, 70 T.C.M. 220 (T.C. 1995) (taxpayers business deduction for expense for condominium they claimed was used by clients denied where they provided only uncorroborated testimony and no specifics or information about alleged use by clients). *Crawford v. C.I.R.*, 65 T.C.M. 2540 (T.C. 1993) (home office deduction for taxpayer doctor denied where evidence did not show the frequency and regularity of visits by patients to home office, or even if there were such visits in the years at issue); *Roth v. C.I.R.*, 43 T.C.M. 45 (T.C. 1981) (when taxpayer kept no records of client meetings and could not state precisely how

many meetings occurred the claimed business expense deduction was denied). The evidence provided by the Debtor in the present case falls into this same category. He provided only vague approximations concerning the alleged use of the Property for client meetings. Thus, his attempt to characterize expenses related to the Property as a tax-deductible business expense could be denied simply based on lack of evidence.

Under federal tax law, to establish deductibility a taxpayer must also show a claimed business expense is both "ordinary" and "necessary." *Welch v. Helvering*, 290 U.S. 111, 113 (1933); *26 U.S.C. §162(a)*. The term "necessary" in this context imposes only the minimal requirement that the expense be "appropriate and helpful" for the development of the taxpayer's business. *See INDOPCO, Inc. v. C.I.R.*, 503 U.S. 79, 85 (1992). The Court is willing to assume the described use of the Property could meet this very low bar. The term "ordinary," however, is more problematic for the Debtor. To qualify as ordinary, the transaction which gives rise to an expense must be of common or frequent occurrence in the type of business involved. *Deputy v. Du Pont*, 308 U.S. 488, 495 (1940).

The *Du Pont* case stressed that each case will turn on its special facts, but the general principle involved is whether a business person involved in the same sort of activity would consider the expense in question to be "embraced within the normal over-head or operating costs of such activities." The Debtor provided no evidence to show that the typical financial consultant with adequate office space available elsewhere would incur the expense of maintaining an additional "casual office" setting that is used but, by Debtor's own admission, very rarely. The Debtor would thus appear to face a difficult task of demonstrating to taxing

officials the expenses related to the Property qualify as ordinary expenses.[12]

Federal tax law, by analogy, thus provides another basis in support of the Court's conclusion that the expenses related to the Property should not be allowed to reduce the Debtor's disposable income pursuant to *Section 1325(b)(2)(B)*.

The Debtor alternatively argues that he may continue to make the mortgage payment as a payment on a secured debt.[13] As an above median debtor, the Debtor's expenses are calculated "in accordance with subparagraphs (A) and (B) of section 707(b)(2)." *11 U.S.C. §1325(b)(3).  Section 707(b)(2)(A)(iii)(II)*[14] allows a debtor to deduct

> [A]ny additional payments to secured creditors necessary for the debtor, in filing a plan under chapter 13 of this title, to maintain possession of the debtor's primary residence, motor vehicle, or other property ***necessary for the support of the debtor*** and the debtor's dependents, that serves as collateral for secured debts; divided by 60.

(emphasis added). *See also In re Amos*, 452 B.R. 886, 889 (Bankr. D.N.J. 2011). The court has discretion to determine whether the payment on the secured debt is necessary for the Debtor's

---

[12]    The Court notes that the inability to meet this burden provides a logical alternative explanation as to why the Debtor has not attempted to take a business expense deduction related to the Property in his federal tax returns since his 2008 filing to the present.

[13]    On the Debtor's Form B22C, it appears he did not include payment of the Pgh. Rd. Property as a business expense in Section 3 of the Form even though he has argued throughout the pendency of this matter that the Pgh. Rd. Property is reasonably necessary to the continuation, preservation, and operation of his financial planning business.  Instead, the Debtor included a deduction for the Pgh. Rd. Property in Section 47 of Form B22C as a "Deduction for Debt Payment\Future Payments on a Secured Claim."  Rather than relying on *Section 707(b)(2)(A)(iii)* to place his argument in context concerning the deductibility of an allowed secured claim for purposes of calculating his disposable income, the Debtor uses a "form argument" by referencing Line 47 of Form B22C in support of his claim.  Since Form B22C is simply the vehicle used to determine the calculation, the preferred approach would be to argue the effect of the statute on the disposable income calculation.  Nevertheless, the Court will recognize the Debtor's approach, since the Parties end up at the same place regardless of the approach used.

[14]    *Section 707* also known as the" Means Test" is made applicable to Chapter 13 debtors by *11 U.S.C. §1325(b)(3)*.

support. *Id.*   Based on the testimony at trial as noted above, the Pgh. Rd. Property is not necessary for the support of the Debtor.

The facts of this case are similar to those identified in *Amos*.   There, a creditor objected to the debtors' Chapter 13 plan, because it proposed to cure the arrearages and continue to pay the mortgage on the debtors' vacation home while paying nothing to their unsecured creditors. The home was not the Debtor's primary residence, but was described as an investment property. The debtors' Schedule J included $1,997 per month for the mortgage payment on the investment property, and the debtors' Form B22C reflected a negative disposable income. The court held the debtors' payment for the investment property was not a reasonable and necessary expense under *Section 1325(b)(1)* nor was the property essential.

According to the court's reasoning in *Amos*, it is proper to consider "the nature and purpose of the collateral" in determining whether the debtors are allowed to deduct payments for the property.   *Id.* at 892.   In reaching this determination, the court relied on the Supreme Court's "recent decisions" rejecting the "mechanical application" of *Sections 1325(b)(3)* and *707(b)(2). Id. See also Hamilton v. Lanning,* 560 U.S. 505 (2010); *Ransom v. FIA Card Servs.*, 131 S. Ct. 716 (2011).   The court found that when the decisions of *Hamilton* and *Ransom* are "[v]iewed together … [they] suggest a willingness to inject judicial discretion both into the applicability of the specific deductions allowed under §707(b)(2)'s means test and into the calculation of 'projected disposable income' …. "   *In re Amos*, 452 B.R. at 892. [15]

---

[15]    Nevertheless, the *Amos* court was compelled to find that the Debtors were not required to make payments to their unsecured creditors, because regardless of whether the payments on the investment property were disallowed, the debtors would still generate a negative disposable income.

Similar to *Amos,* based on the testimony of Wife and Attorney Criss, which was not controverted to any extent by the evidence proffered by the Debtor, other than by his denials, it appears the true intent of the Debtor is to keep the Pgh. Rd. Property as an investment, rather than using it as a business property, in hopes of one day being able to cash-in on the Pgh. Rd. Property to the detriment of his unsecured creditors. Also, based on the nature and purpose of the Pgh. Rd. Property, it is clearly not essential for the support of the Debtor.

Furthermore, unlike *Amos*, the Debtor has a projected disposable income greater than zero which will only increase now that the Court has determined the Pgh. Rd. Property is not necessary to the continuation of the Debtor's business and for the Debtor's support. As such, the Debtor may not continue to deduct the mortgage and other payments for the Pgh. Rd. Property from his disposable income on Form B22C. Excluding the Pgh. Rd. Property from the Debtor's disposable income calculation results in an additional $1,038.90 per month that may be used to pay the Debtor's unsecured creditors.[16]

The Court also notes that, although not raised by Wife, even as currently filed, the 2nd Amd. Plan fails to commit all of the Debtor's projected disposable income to his unsecured creditors. To determine whether the debtor is committing his projected disposable income to pay his unsecured creditors, the Court may utilize the Debtor's Form B22C calculation and multiply it by the number of remaining months in the proposed plan to determine the Debtor's projected disposable income. *See In re May,* 381 B.R. at 506 (citing *In re Alexander,* 344 B.R. 742, 749 (Bankr. E.D. N.C. 2006)).

---

[16]     Previously, Wife argued that the Debtor was making payments on the Pgh. Rd. Property and two townhouses totaling $1,914, ostensibly all to the detriment of unsecured creditors. The Court has excluded the payment on the townhouses from consideration, since Wife has apparently abandoned that argument; the Parties having agreed that the only issue for determination by the Court for purposes of the evidentiary hearing was the propriety of the mortgage payment on the Pgh. Rd. Property with Wife offering no other record evidence by stipulation or otherwise to the contrary.

Based on the Debtor's $318.70 in alleged projected disposable income, the Debtor must pay his unsecured creditors <u>at least</u> $19,122 ($318.70 x 60) over the life of the 2nd Amd. Plan for it to be confirmable. Currently, the Debtor is only proposing to pay his unsecured creditors $6,557.79. Even including the Pgh. Rd. Property, the Debtor's 2nd Amd. Plan does not pay all of his projected disposable income to his unsecured creditors.

In conclusion, payments for the Pgh. Rd. Property may not be deducted when calculating the Debtor's projected disposable income, because the Property is not reasonably necessary to the continuation of the Debtor's business and is not necessary for his support.  Thus, the 2nd Amd. Plan does not provide for payments to unsecured creditors of all of the Debtor's projected disposable income and thereby does not meet the disposable income test.  Therefore, the Court finds that the Debtor's 2nd Amd. Plan is not confirmable for that reason as well.

### (3)  The Good Faith Test

Another requirement for plan confirmation is that the plan must be proposed in good faith.  *11 U.S.C. §1325(a)(3)*.  Wife alleges the 2nd Amd. Plan was not filed in good faith, because the sole reason for the Debtor filing his Chapter 13 bankruptcy (as opposed to a Chapter 7 filing) was to avoid paying Wife her equitable distribution award. According to Wife, if the Debtor had not filed for Chapter 13, he would be faced with a nondischargeable equitable distribution obligation that required full payment and not one subject to discharge under the Bankruptcy Code.  This is the sole basis for her contention that the 2nd Amd. Plan fails to meet the good faith requirement.

The Third Circuit has expressly rejected "the question of whether the debt would be non-dischargeable in a Chapter 7 proceeding" as a relevant factor in the determination of whether a Chapter 13 case was filed in good faith. *See In re Lilley*, 91 F.3d 491, 496, n. 2 (3d. Cir. 1996). Thus, Wife's sole ground of objection cannot even be considered in the Court's analysis of whether the Debtor's 2nd Amd. Plan was filed in good faith. In other words, Wife's objection, standing alone, is insufficient to make a finding that the 2nd Amd. Plan was proposed in bad faith. The Court could simply deny the objection on that basis alone and stop here, but for the sake of completeness and to avoid a rehash of the good faith argument being leveled against any subsequent plan filed in this case, it will proceed to conduct a full analysis of whether the 2nd Amd. Plan was proposed in good faith.

When determining whether a debtor's Chapter 13 plan has been proposed in good faith, courts look to the totality of the circumstances. *See In re Young*, No. 12-06245, 2013 WL 6223831, at *3 (Bankr. M.D. Pa. Dec. 2, 2013) (the same totality of the circumstances test for determining whether to dismiss a case under *Section 1307(a)* is used to evaluate whether a plan was filed in good faith) (citing *Members First Fed. Credit Union v. Fickel (In re Fickel),* No. 07-02822, 2008 WL 1710102, at *2 (Bankr. M.D. Pa. Apr. 10, 2008)).

In the Third Circuit, bankruptcy courts apply the following factors in deciding whether a debtor's plan was filed in good faith: (1) the nature of the debt; (2) the timing of petition; (3) how the debt arose; (4) the debtor's motive in filing the petition; (5) how the debtor's actions affected creditors; (6) the debtor's treatment of creditors both before and after the petition was filed; and, (7) whether the debtor has been forthcoming with the bankruptcy court and the creditors. *In re Myers*, 334 B.R. 136, 142 (E.D. Pa. 2005) *aff'd*, 491 F.3d 120 (3d

Cir. 2007).   Applying each of the factors here, the Court finds that the 2nd Amd. Plan was proposed in good faith.

The nature of the debt the Debtor seeks to discharge through the 2nd Amd. Plan is an equitable distribution award. The exceptions to a Chapter 13 discharge are narrower than the exceptions to a Chapter 7 discharge and therefore allow a debtor to discharge in Chapter 13 debts that are in the nature of a property settlement. *See 11 U.S.C. §§523(a)(15); 11 U.S.C. §1328(a)(2)*.  *See United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 268 (2010) (acknowledging that a Chapter 13 discharge "is broader than the discharge received in any other chapter") (quoting *8 Collier on Bankruptcy §1328.01* (Rev. 15th Ed. 2008)).  *See also In re Kennedy*, 442 B.R. 399 (Bankr. W.D. Pa. 2010)  Furthermore, neither the Debtor nor Wife disputes that the equitable distribution obligation under the State Court Order is in the nature of a property settlement and is therefore dischargeable in Chapter 13.  *See 11 U.S.C. §§523(a)(5) and (15)*.  Here, the 2nd Amd. Plan properly utilizes the more liberal Chapter 13 discharge provisions to discharge the equitable distribution obligation under the State Court Order.  *See, e.g., In re Lansaw*, 358 B.R. 666, 673 (Bankr. W.D. Pa. 2006) (court could not find, as a matter of law, that taking advantage of a statute that applied to debtor's circumstances was an act of bad faith).

Nor does the timing of the Debtor's petition filing demonstrate any bad faith by the Debtor.  Pursuant to the State Court Order, the Debtor was given only thirty days to pay Wife $161,422.42.  Although no stipulation or other record evidence was offered directly on point as to the Debtor's ability to make such a large payment in just 30 days, the Court can reasonably infer from the record before it that no liquid assets were available to the Debtor to make such a

payment in such a short time.  The Debtor did argue in his *Pretrial Brief* [17] that he was unable to timely pay the equitable distribution award or post the required bond for purposes of appeal, but as previously noted, statements in briefs cannot be considered evidence.  Nevertheless, based upon the totality of the circumstances related to this issue and the record before the Court, it is clear the Debtor was in no position to do either of these things at the time he was confronted with them.

Applying the third factor and focusing on how the debt arose, the Court also finds no lack of good faith in the filing.  As previously noted, the debt arose as a result of an equitable distribution award in the divorce action between the Debtor and Wife.  Unfortunately, divorce is a fact of life.  So much so that typically, the applicable state statutory law controlling such matters is complex and extensive.  Pennsylvania statutes and family law practice are no exception.  Filing bankruptcy and proposing a plan as a result of debt arising from the dissolution of the marriage by two parties availing themselves of the state statutory divorce scheme, alone, cannot be considered bad faith.

The fourth factor, i.e., the Debtor's motive in filing the petition, also demonstrates no lack of good faith when the 2nd Amd. Plan was filed.  As previously noted, the Debtor filed for bankruptcy, because he was unable to pay the $161,422.42 equitable distribution award or post an adequate appeal bond within the thirty days required by State Court Order.  In a vacuum, the State Court Order does appear somewhat aggressive in this regard.   No testimony or other evidence of record was offered by Wife to indicate the Debtor actually had an ability to make such a payment in such a short time or post the necessary bond.  As such, the mere filing of the Petition in this case does not evidence bad faith related to this factor.

---

[17]        Debtor's *Pretrial Brief,* Doc. No. 133, at 9, n.9.

When considering the fifth factor and whether the Debtor's actions affected creditors, the record supports a finding the Debtor's filing of Chapter 13 may actually have resulted in a net benefit to Wife and other creditors. After the Debtor filed for bankruptcy, Wife and the Debtor entered a *Consent Order* by which Wife was afforded relief from the stay to seek a modification of alimony. In making this determination, the state court considered the effects of the Debtor's bankruptcy on Wife's equitable distribution award and sought to mitigate those effects.[18] In so doing, the state court extended the Debtor's alimony obligation by thirty-six months, and as a result, Wife is now in a position to receive an additional $90,000 in alimony.[19]

---

[18] While acknowledging that it did approve the *Consent Order* allowing relief from stay to pursue modification of alimony (albeit, under less than perfect circumstances, *See n. 2*, *supra*), the Court nevertheless questions the state court's basis for extending the Debtor's alimony obligation. Most courts that have done so, including the courts cited by the state court in its order, only extend alimony after the order effecting a discharge of the equitable distribution claim has already been entered. *See In re Siragusa*, 27 F.3d 406, 408 (9th Cir. 1994) (a court may properly consider a debtor's *discharge* as a changed circumstance) (emphasis added); *Cropper v. Cropper*, 22 Pa. D. & C. 4th 451, 456 (Com. Pl. 1993) (where an alimony award is based on misinformation and avoided through a bankruptcy discharge, a modification of alimony is proper); *In re Smith*, 218 B.R. 254, 260 (Bankr. S.D. Ga. 1997) (discharge of a debtor's debts, including divorce obligations, may be relied upon in a state court proceeding to modify a divorce decree of alimony); *In re Danley*, 14 B.R. 493, 495 (acknowledging a bankruptcy discharge may be a change circumstance for modification of alimony); *In re Marriage of Trickey*, 589 N.W.2d 753, 756 (Iowa Ct. App. 1998) (a debtor's discharge of a property settlement through bankruptcy may serve as a consideration for modifying alimony). Unlike the cases cited above, in this case the state court preemptively extended the alimony before a discharge was entered on the mere assumption that the Debtor's equitable distribution order would be discharged through his Chapter 13 plan. Currently, there is no confirmed plan nor has a discharge been entered. Therefore, the "changed circumstances" the state court relied on in extending Wife's alimony have yet to come to fruition, and indeed may never happen. Nor has the bankruptcy "thwarted" Wife's equitable distribution claim. Typically when this Court grants relief from stay so parties can resolve any pending divorce issues in state court, it reserves the right to consider the effect of such award on the distribution ultimately expected in the bankruptcy. Here, stay relief was granted by way of *Consent Order* offered by the Parties. No such reservation was contained in the *Consent Order* so the Parties are ostensibly bound by the state court's ruling. The Debtor neither appealed the state court order nor has objected to it in this proceeding. In fact, the Debtor has acknowledged his responsibility to pay this extended alimony obligation in the 2nd Amd. Plan.

[19] The state court's extension of alimony also appears to be a substitute for the amount of the equitable distribution order the Debtor proposes to discharge. *In re Marriage of Trickey*, 589 N.W.2d at 757. ("If the modification is essentially a reinstatement of the property settlement under the guise of alimony, the modification violates section 524 and is not permitted"). *See also In re Siragusa*, 27 F.3d at 408. The state court found that the Debtor's bankruptcy would deny Wife approximately $66,556 of her equitable distribution award and that she has incurred approximately $23,632 in attorney's fees as a result

Therefore, the Debtor's bankruptcy filing, to a large extent, created a benefit to Wife since she received an extension of her alimony award as a result.  Furthermore, if the 2nd Amd. Plan is confirmed, the Debtor's priority unsecured creditors will also be paid in full.  This result alone weighs in favor of finding that the 2nd Amd. Plan was filed in good faith.

The sixth factor, requiring an examination of the Debtor's treatment of creditors both before and after the petition was filed, provides some indicia of bad faith. As discussed in detail above, the Debtor includes his postpetition domestic support obligation payment to demonstrate his 2nd Amd. Plan meets the LAT.  Based on the Court's findings, above, the Debtor may not include his postpetition alimony obligation to meet this requirement.  By including his postpetition alimony obligation, the Debtor appears to be improperly attempting to avoid paying Wife her equitable distribution award to the full extent required.  Resolution of this factor in light of the current record, indicates that the 2nd Amd. Plan may not have been filed in good faith.  On the other hand, the treatment of the postpetition domestic support obligation vis-à-vis the LAT, as is clear from this *Memorandum Opinion*, is a somewhat complex legal issue and as such, the Court is not inclined to give this factor much weight.

Lastly, as to the seventh factor, determining whether the Debtor has been forthcoming with the Bankruptcy Court and the creditors, the Court finds no lack of good faith in the mere filing of the 2nd Amd. Plan.  The Court finds that throughout this matter the Debtor has been fairly candid and forthcoming in all respects in his dealings with the Court and his creditors.  His petition reflects the assets he is attempting to retain and the payments necessary to

---

of the Debtor's bankruptcy. As a result, the state court extended the Debtor's alimony obligation for an additional 36 months or $90,000. This award principally, dollar for dollar, accounts for the amount the Debtor proposed to discharge through the Plan and Wife's attorney's fees. While the Court disagrees with the state court's order, for the reasons given in n. 18, above, a determination of the Court's power to deny final effect to the state court's actions will be reserved for a later time.

maintain those assets.  There has been no allegation of any attempts to hide assets or not disclose them.  The fact that he may propose a more favorable approach to distribution of those assets (from his point of view) than the Court may ultimately allow is in no way indicative of bad faith.

Based on all of the foregoing, and weighing the effect of each factor against the concept of a lack of good faith in filing the 2nd Amd. Plan, Wife has failed in meeting her initial burden to show that the 2nd Amd. Plan was filed other than in good faith.  Even if she had demonstrated some evidence of bad faith, the Debtor has met his overall burden of proving that his Plan was proper and in good faith.

### A.  Debtor's Objection

As noted previously, Wife and the Debtor also dispute the total of alimony arrearages to be paid through the 2nd Amd. Plan.  At issue is the Wife's Proof of Claim 3-3 filed on May 1, 2013, and the *Debtor's Objection* timely filed in response.  The Parties agree there was an alimony arrearage owed by the Debtor as of the date the case was filed, but they disagree as to the amount. [20]

Before considering the specifics of the *Debtor's Objection*, it is important to further detail the applicable law as to the allocation of the burden of proof which the Court is required to follow.  It is somewhat complex, but clear and longstanding:

---

[20]      Wife created some initial uncertainty to resolution of this issue by stating in Item 1 of her Proof of Claim 3-3 that the amount of alimony arrears she was claiming was "owed as of May 1, 2013." Apparently, the Parties now, however, agree that the relevant date for determination of the proper amount of the arrearage claim is the filing date of the case, *i.e.*, December 30, 2011.  *See also 11 U.S.C. §502(b)* (if an objection to claim is filed, court is to determine the amount of such claim "as of the date of the filing of the petition, and shall allow such claim in such amount."  Indeed, Item 1 of the Proof of Claim Form, Official Form 10, is entitled "Amount of Claim as of Date Case Filed."

> The law concerning an objection to a proof of claim is well-settled. The burden of going forward lies with different parties at various stages. The initial burden lies with the claimant, who must allege sufficient facts to establish the prima facie validity of the claim.  If the claimant does so, the burden then shifts to the objector to produce evidence which is "equal in force" to the evidence establishing the prima facie validity of the claim. The objector must produce evidence which, if believed, would defeat at least one of the essential elements of the claim.  If the objector succeeds in this regard, the burden then shifts to the claimant to prove the validity of the claim by a preponderance of the evidence.
>
> While the burden of production may shift, the burden of persuasion does not. It lies with the claimant throughout.

*In re Wolfe*, 378 B.R. 96, 102 (Bankr. W.D. Pa. 2007) (citing *In re Allegheny Int'l Inc.,* 654 F.2d 167, 173-74 (3d. Cir. 1991).

In her attachment to Proof of Claim 3-3, Wife alleges that the amount of arrearage at the time of commencement of the case was $26,049.21.  She also now agrees that the Debtor was entitled to a "credit" of $2,500 on his alimony arrearage based on an order entered on January 7, 2013, by the state court in the Parties' divorce action, which order in turn was based on an April, 2009 order in that same case.  The net result is that Wife currently asserts an arrearage amount of $23,549.21 as of the bankruptcy filing date.  Nor does the Proof of Claim include any sort of "official" document to establish the amount of the arrearage as of the filing date.  It does, however, contain a copy of the January 7, 2013 state court order and the memorandum opinion that accompanied it, as well as an "Attachment," signed by Counsel for the Wife, that describes how the arrearage amount was calculated.  The Court finds the Proof of

Claim and the documents appended thereto are sufficient to establish the prima facie validity of the claim in the amount alleged.[21]

The burden thus shifts to the Debtor to produce evidence of at least equal force to defeat at least one element of Wife's claim.  In an effort to meet this burden, the Debtor has provided a stipulated copy of a letter from the Butler County Family Court Administrator to Debtor's Attorney dated February 14, 2013 which states that, as of this date, an alimony balance of $49,949.21 was due by the Debtor.  A follow-up e-mail from the Family Court Administrator dated February 15, 2013, states that if $36,400 is applied (i.e., the amount of plan payments attributable to the alimony obligation that the Debtor had made up to that point in time, which payments were not then being tracked in the state court), the balance as of February 14, 2013, would be $13,549.21.  The Debtor goes on to argue that the $36,400 in plan payments represented 13 monthly payments of $2,800, in each of which $2,500 was allocated for "current" alimony and $300 for arrears.  Thus, the Debtor paid $32,500 toward current alimony and $3,900 toward his alimony arrearage between the start of the case and the February 14, 2013 letter from Butler County.  He therefore contends that if the arrearage component is added back to the $13,549.21 balance shown as of the letter date, that will establish the amount of the arrearage that was owed as of the bankruptcy filing date.  According to his calculation, the total should

---

[21]    *Fed.R.Bankr.P. 3001(c)* states the general rule that when a claim is based on a writing, a copy of the writing must be filed with the proof of claim.   It does not appear to the Court that the alimony arrearage claim in the present case is of that type, or if it is, the attached copy of the state court order and opinion is sufficient for compliance.  *See In re Lampe*, 665 F.3d 506, 514 (3d Cir. 2011) (*Rule 3001(c)* only applies when a writing created the purported obligation and is not applicable merely because a document might play some role in establishing the claim; further indicating that *Rule 3001(c)* is simply meant to provide the Debtor with fair notice of the conduct, transaction, and occurrence that form the basis of the claim).  Furthermore, and in any event, the Debtor has not objected that the Proof of Claim is invalid because it fails to attach any particular "writing" that might be required by *Rule 3001(c)*.

more probably be $17,449.21.   Therefore, this is the amount that the Debtor says is the proper
arrearage claim.

      The Debtor's path to reaching this result is certainly a roundabout one, but the
Court cannot conclude that it is wrong.  Assuming the "known" balance as of February 14, 2013,
to be correct, which the Court is willing to do for present purposes based on the source of the
information, as stipulated to by the Parties, it follows as a matter of mathematics and logic that
deducting postpetition alimony-related plan payments less the portion of such payments
attributable to arrearage, should yield the arrearage balance as of the date the case was filed.  The
Court thus finds the Debtor has met his burden of producing evidence of at least equal force to
that produced by Wife which, if believed, would defeat at least one essential element of her
claim, namely the amount of such claim.

      Given the Debtor's success in this regard, under the applicable shifting standard,
Wife now has the ultimate burden of proving her claim by a preponderance of the evidence.  The
primary way she attempts to do this is through a printout of the PASCES [22] account history
summary provided by the Butler County Domestic Relations Section on September 19, 2013
covering the period from November 1, 2011 through January 2, 2012.  This account history
summary indicates a balance of $26,049.21 was owed as of December 22, 2011, the last date

---

[22]     According to its website, apparently PACSES is the PA statewide computer system that
is used by county domestic relations sections to maintain case, personal and payment information in order
to monitor support payments and enforce court support orders.  The Parties never identified it as such in
this record nor did they explain the binding effect, if any, of its records on this Court.  Although CR Ex.
17 is a stipulated exhibit, the Debtor argues that it is "known to be incorrect." Moreover, Wife's own
filings demonstrate an error at least in the amount of $2,500. Under these circumstances, the Court is
unable to give the calculations in the printout any evidentiary effect beyond that given to it.  *See* Order
dated October 17, 2013 filed at Document No. 123 (the Court will only rely on the record before it and
not seek to establish facts not identified by the Parties).

shown on the summary prior to the date of the bankruptcy filing.  *See* CR Ex. 17.  This figure

does not reflect the $2,500 credit effected by the January 7, 2013 State Court Order, even though

Wife's own pleadings evidence that such amount must be deducted from the balance shown in

the PASCES summary to arrive at the correct arrearage figure for her claim.  When this is done,

the amount Wife claims to be due in alimony arrearage actually is $23,549.21, which is

somewhat consistent with her Proof of Claim.

This is certainly some additional evidence beyond the Proof of Claim itself to

show that the Wife is correct as to the amount of the arrearage, but is it enough to meet her

burden of proof by a preponderance of the evidence?  The Court thinks not.  The evidence

adduced by both sides results in a stalemate.  Each party has produced evidence from an equally

credible source, and in fact from the same source – the Butler County Court.  Furthermore, the

evidence of neither Party is "self-contained" in the sense that neither can just point to the final

number somewhere on the document they have provided, but rather, must explain how their final

number is arrived at after additional manipulation/calculation beyond what the proffered

document itself shows.  The end result urged by each side is logical and reasonable, but

obviously both cannot be right since they end up $6,100 apart.[23]

There was no testimonial evidence presented at the hearing on the issue of the

alimony arrearage, which hearing testimony the Parties agreed was to encompass only the Pgh.

Rd. Property issue.  The Parties merely relied upon the stipulated documentary evidence

discussed above.  Thus, on the record before it the Court has no way of determining which side is

---

[23]    The fact that the difference in the Parties' contentions is a round number like $6,100
would seem to suggest that it results from an overcounting or undercounting of monthly payments by the
Debtor somewhere along the line since those payments are also in round, $100 increments.  The Court,
however, has no way of finally determining that fact based on the record before it and will not speculate
further in that regard.

correct and no principled grounds to "break the tie."  Since the Wife has the ultimate burden to prove her claim by a preponderance of the evidence, and she has failed to do so, the Court therefore has no alternative but to grant the *Debtor's Objection*.  Proof of Claim 3-3 will be denied, without prejudice to being refiled within 30 days.  The Court is hopeful that in the interim the Parties will make an effort to confer among themselves (and with Butler County as well if necessary) to try to agree on the proper claim amount for the alimony arrearage.  Such agreement could save yet further litigation, expense and delay on an issue that should not be all that, in the Court's view, difficult to resolve.

### *CONCLUSION*

The Debtor's attempt to satisfy the requirements of the *11 U.S.C §1325(a)(4)* "Liquidation Alternative Test," by adding his postpetition domestic support obligation payments to the calculation and thereby avoid the liquidation of non-exempt assets with a significant aggregate net value, is not supported by applicable law.  Furthermore, for purposes of meeting the requirements of the *11 U.S.C. §1325(b)(1)(B)* "Disposable Income Test" in calculating his available projected disposable income for the benefit of unsecured creditors, the monies dedicated to payment of the Pittsburgh Road Property obligations cannot be used to reduce the available disposable income calculation.  Therefore, even though the Debtor's 2nd Amended Plan was filed in good faith, for each of the above reasons it is presently unconfirmable and must be denied for those reasons.

Also, since Wendy L. McKinney failed to meet her burden of proof in support of her claim for alimony arrearages, as detailed in Proof of Claim No. 3-3, the claim must be

denied.  However, in light of the circumstances presented in this case, Mrs. McKinney will be

given an opportunity to refile her claim consistent with the findings and conclusions set forth in

this *Memorandum Opinion*.

An appropriate order follows.

Dated:  March 18, 2014

Thomas P. Agresti, Judge
United States Bankruptcy Court

Case administrator to serve:
    Debtor
    Dai Rosenblum, Esq.
    Mary Bower Sheats, Esq.
    Jeanne S. Lofgren, Esq.
    Ronda J. Winnecour, Esq., Chapter 13 Trustee